**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stone Creek Incorporated,<br><br>Plaintiff,<br><br>v.<br><br>Omnia Italian Design Incorporated, et al.,<br><br>Defendants. | No. CV-13-00688-PHX-DLR<br><br>**ORDER** |

This matter was tried before the Court without a jury for four days commencing on October 20, 2015, and concluding on October 23, 2015. Having considered the evidence introduced at trial, the arguments of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Stone Creek, Inc. ("Stone Creek"), an Arizona Corporation, brought this case against Omnia Italian Design, Inc. ("Omnia") alleging claims of federal and common law trademark infringement and unfair competition.

2. Stone Creek is a company that manufactures and sells furniture in Arizona.

3. Stone Creek has operated solely out of the Phoenix, Arizona area, except for a period from 2004 to 2008, during which it also manufactured and sold furniture in Dallas, Texas.

4. Around 1990, Stone Creek adopted and began using the STONE CREEK mark:



5. The STONE CREEK mark is a "red oval-shape circle around the words 'Stone Creek.'"
6. In 1992, Stone Creek first obtained state trademark and trade name registrations for the trade name "Stone Creek Furnishings" and the following trademark: "oval encircling the trade name of Stone Creek."
7. Stone Creek renewed the trade name and trademark certifications in 2006.
8. On February 7, 2012, Stone Creek became the owner of U.S. Registration No. 4,095,866 for the word mark STONE CREEK in standard characters, and U.S. Registration No. 4,096,079 for the wording STONE CREEK surrounded by a stylized, red oval.
9. Household furniture is typically sold locally to customers living within a drivable radius from the furniture outlet retail store.
10. The size, weight, and costs to ship, as well the customers' preference to see and sit on the furniture, has created the retail furniture business model; local furniture stores.
11. Stone Creek follows the typical retail furniture store business model, selling its furniture locally in the Phoenix area.
12. Stone Creek delivers furniture locally but does not ship furniture out of state.
13. Stone Creek has a website, but does not sell furniture directly through its website. It does not engage in internet sales.
14. Stone Creek operates five showrooms in the Phoenix, Arizona area.
15. The President and owner of Stone Creek, Ron Jones, has had a goal of expanding Stone Creek, but there are no plans to expand and there have been no acts directed toward expanding after Stone Creek closed its Texas operations.

16. The Bon-Ton Stores, Inc. ("Bon-Ton") is a large retailer that operates furniture galleries in Illinois, Wisconsin, Pennsylvania, Ohio, and Michigan.

17. Omnia's products are sold to purchasers living within 200 miles of a Bon-Ton Furniture gallery, which includes portions of Iowa, Indiana, Ohio, Wisconsin, Pennsylvania, Illinois, and Michigan, the Bon Ton trading territory. (the "BTTT").

18. The parties' distinct trading territories are separated by over 1000 miles at their closest points and nearly 2000 miles at their furthest.

19. From 1993 through 1998, Stone Creek advertised its brand in the monthly Southwest Airlines Spirit magazine and America West's in-flight magazine ("airline magazines").

20. These airlines travelled in Arizona, as well as throughout the BTTT.

21. In 1998, Stone Creek began advertising in Phoenix Magazine and Phoenix Home and Garden Magazine ("Phoenix magazines").

22. Neither the airline magazines nor the Phoenix magazines had or have a significant presence in any of the BTTT states and none of them created awareness of Stone Creek in the BTTT.

23. Stone Creek's marketing channels existed only within the State of Arizona during the relevant time period.

24. Stone Creek did not target advertising or marketing at the BTTT during the relevant time period.

25. Stone Creek placed its mark on its website, stonecreekfurniture.com, as early as 2000.

26. Stone Creek hired Netwirks to increase its brand exposure through search engine optimization.

27. Netwirks has been successful at establishing the STONE CREEK mark.

28. Consumers can access Stone Creek's website by going to stonecreekfurniture.com or by searching for "stone creek" and "leather," "furniture" or "sofa."

29. The website has not created awareness of Stone Creek in the BTTT.
30. The vast majority of Google searches for Stone Creek Furniture originate in Arizona.
31. The number of Google searches for the Stone Creek website from the BTTT is negligible.
32. Consumers in the BTTT are not aware of Stone Creek Furniture.
33. There are many businesses within the BTTT that operate under the name of Stone Creek.  These businesses do not sell furniture.
34. Dr. Cowan, an expert in statistics and economics, conducted a brand awareness survey in the BTTT.
35. 99.75% of the respondents to the survey are not familiar with Stone Creek in Arizona and Stone Creek has no brand awareness in the BTTT.
36. Stone Creek has realized more than $200,000,000 in sales since inception, mostly in the Phoenix area.  Approximately 0.3% of its total sales occurred in the BTTT, breaking down as follows:

| State | Date of First Sale | Years with Sales | Total Sales $ |
|---|---|---|---|
| Illinois | 1/4/1996 | 1996-2009, 2011-2013 | $346,820.90 |
| Ohio | 1/29/1996 | 1996-1998, 2002, 2003, 2005-2007, 2009 | $32,014.25 |
| Pennsylvania | 1/31/1996 | 1996-2003, 2005-2007, 2009, 2011 | $65,607.25 |
| Michigan | 2/7/1996 | 1996-2004, 2006, 2007, 2009, 2010, 2013 | $88,517.33 |
| Wisconsin | 3/26/1996 | 1996-1999, 2003-2006, 2008, 2010, 2011, 2013 | $77,424.71 |
| **Totals** | | | **$610,384.44** |

37. Stone Creek has the customer list for its approximate 65,000 transactions since its inception, including the approximate 150 customers from the BTTT who, since inception, purchased Stone Creek furniture.

38. The number of Stone Creek customers and the total value of those sales from the BTT since Stone Creek's inception is trivial considered in light of the number of total sales and the total value of those sales over that period of time.
39. There is no evidence presented as to how any of the approximate 150 customers from the BTTT came to know of Stone Creek or why any customer from the BTTT purchased from Stone Creek.
40. In 2003, Stone Creek met Omnia at a trade show in San Francisco.
41. Omnia is a California-based manufacturer of leather furniture.
42. Omnia marketed its products to Stone Creek by explaining Omnia's leather furniture would fit well with Stone Creek's existing sofa and seating lines.
43. In 2003, Omnia entered into an Agreement with Stone Creek to manufacture leather branded with Stone Creek's STONE CREEK mark for Stone Creek's business.
44. From 2003 through 2012, Stone Creek was Omnia's customer.
45. Prior to 2008, Omnia had solicited Bon-Ton's business for a number of years.
46. In 2008, Bon-Ton became one of Omnia's "significant" customers.
47. Bon-Ton did not want to sell Omnia's furniture under the "Omnia brand," it wanted a private label—i.e. a name other than Omnia to avoid competition with Omnia's other customers.
48. After Omnia and Bon-Ton agreed that Omnia would become Bon Ton's supplier of leather furniture, Bon Ton indicated that it would like a label with an "American made name."
49. Omnia's president offered several suggestions, including STONE CREEK.
50. Bon Ton decided to market some of its furniture under the STONE CREEK name.
51. Bon Ton's decision to use Omnia as a supplier was not tied to nor conditioned on the use of the STONE CREEK mark.
52. Omnia knew of Stone Creek's use of the mark at the time Omnia offered it for Bon-Ton's private label.

53. Omnia copied the STONE CREEK mark from materials provided to it by Stone Creek.
54. Omnia's president provided old documents that had the STONE CREEK logo on it to its brand manager and told him to recreate the identical STONE CREEK logo.
55. The mark was digitally recreated because the resolution from scanning the old documents was too low.
56. Omnia selected the STONE CREEK mark for Bon-Ton's private label, in part, because it sounded American and because marketing materials and a logo were already prepared.
57. Omnia did not choose the mark with the intent of trading off of Stone Creek's goodwill.
58. The logo was the identical STONE CREEK mark that Stone Creek provided to Omnia for use on its private label.
59. Omnia never asked Stone Creek if it could use the mark.
60. Omnia never consulted an attorney regarding whether it could place the STONE CREEK mark on furniture being sold to Bon-Ton.
61. Omnia's president since 2004, Peter Zolferino, having been in the furniture business and having done business with Stone Creek, understood that Stone Creek sold in the Phoenix area, but he never researched where Stone Creek sold its furniture.
62. Omnia never performed an internet or other documentary search to determine where or how Stone Creek sold its furniture.
63. Omnia never asked where Stone Creek's customers were located prior to using the mark.
64. Omnia never performed any internet or documentary searches to determine where Stone Creek's customers were located.
65. Omnia adopted and used the STONE CREEK mark with full knowledge of Stone Creek's senior use.

66. Bon-Ton entered into an agreement under which Omnia would manufacture leather furniture for Bon-Ton using a private label and Bon Ton would sell the furniture in the BTTT (the "Accused Sales").
67. All of the Accused Sales occurred in the BTTT; none of them occurred in Arizona.
68. From 2008 to 2013, Omnia sold leather furniture to Bon-Ton branded with the STONE CREEK mark.
69. Omnia created point-of-sale binders branded with the STONE CREEK mark.
70. Omnia created a wood leg color board for display in Bon-Ton stores, which had the STONE CREEK mark prominently displayed.
71. Omnia created sample leathers for point-of-sale reference, which were marked with the STONE CREEK mark.
72. Omnia redesigned warranty cards with the STONE CREEK mark and ordered 5,000 new warranty cards for Bon-Ton's STONE CREEK line.
73. In 2013, after inquiries from individuals in the BTTT, Stone Creek asked Omnia if it sold products under the STONE CREEK mark to other companies.
74. Stone Creek's president also fielded a telephone call into its office regarding a customer concerned about a warranty issue on a leather sofa.
75. The customer indicated that he purchased the sofa, which was a STONE CREEK brand, from a Bon-Ton store in Chicago.
76. The customer described a warranty document that had the STONE CREEK mark on it, and the mark led the customer to Stone Creek's website.
77. Stone Creek's president then found its mark being used on furniture sold on Bon-Ton's website.
78. Omnia's use of the STONE CREEK mark was confirmed by Murray Eastern, Omnia's Vice President of Sales, in an email dated January 24, 2013, wherein Mr. Eastern admitted selling furniture under the STONE CREEK mark: "Ron, yes, we do sell our products to those stores under their marketing name 'Stone Creek Leather.'"

79. Mr. Eastern's email went on: "In this day of internet shopping and surfing, it is unfortunate and probably a nuisance for you that your stores are receiving inquiries regarding these products due to the similar name…"
80. After Stone Creek notified Omnia of its complaints in 2013, Omnia changed the name of the furniture that it had been selling under the STONE CREEK name to Red Canyon.
81. Stone Creek's trademark did not earn any goodwill, reputation, or consumer recognition in the BTTT.
82. There was no actual confusion by a consumer in the BTTT purchasing Omnia STONE CREEK furniture.
83. Stone Creek owns the website stonecreekfurniture.com.
84. In February 2013, Omnia was still using the STONE CREEK mark with the red oval around the words "Stone Creek."
85. Omnia's gross revenue from the Accused Sales was $4,455,352.

## **CONCLUSIONS OF LAW**

86. Stone Creek asserts claims for federal and common law trademark infringement and Lanham Act unfair competition.
87. A trademark is any word, name, symbol, device, or any combination thereof, used by a person to identify and distinguish that person's goods from those of others and to indicate the source of the goods, even if that source is generally unknown. 15 U.S.C. § 1127.
88. "A trademark is a limited property right in a particular word, phrase or symbol." *New Kids on the Block v. New Am. Pub., Inc.*, 971 F.2d 302, 306 (9th Cir. 1992). It identifies the source of goods. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1051 (9th Cir. 1999).
89. To prevail on its trademark infringement and unfair competition claims, Stone Creek must show: (1) it owns a valid mark; (2) the mark was used without its consent; and (3) such unauthorized use is likely to cause confusion among ordinary consumers as

|   |   |   |
|---|---|---|
| 1 |     | to the source, sponsorship, affiliation, or approval of the goods.  *See Credit One* |
| 2 |     | *Corp. v. Credit One Fin., Inc.*, 661 F. Supp. 2d 1134, 1137 (C.D. Cal. 2009) |
| 3 |     | (collecting cases and authorities). |
| 4 | 90. | On August 28, 2014, the Court granted summary judgment for Stone Creek on the |
| 5 |     | issues of ownership of the STONE CREEK mark and Omnia's lack of permission to |
| 6 |     | use the mark for the Accused Sales. |
| 7 | 91. | At trial, Stone Creek had the burden to establish that Omnia's unauthorized use was |
| 8 |     | likely to cause confusion.  Stone Creek failed to meet its burden. |
| 9 | 92. | The holder of a trademark in a Lanham Act claim, "must show that the defendant's |
| 10 |    | use of its trademark 'is likely to cause confusion, or to cause mistake, or to |
| 11 |    | deceive.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.,* 618 |
| 12 |    | F.3d 1025, 1030 (9th Cir.2010) (quoting 15 U.S.C. § 1125(a)(1)-(a)(1)(A)).  "The |
| 13 |    | test for likelihood of confusion is whether a 'reasonably prudent consumer' in the |
| 14 |    | marketplace is likely to be confused as to the origin of the good or service bearing |
| 15 |    | one of the marks." *Dreamwerks Prod. Grp. v. SKG Studio,* 142 F.3d 1127, 1129 |
| 16 |    | (9th Cir. 1998). "The confusion must 'be probable, not simply a possibility.'" |
| 17 |    | *Murray v. Cable Nat'l Broad. Co.,* 86 F.3d 858, 861 (9th Cir.1996) (citing *Rodeo* |
| 18 |    | *Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987)). |
| 19 | 93. | Likelihood of confusion is the core element of trademark infringement.  "The |
| 20 |    | limited purpose of trademark protections set forth in the Lanham [Trademark] Act |
| 21 |    | is to 'avoid confusion in the marketplace' by allowing a trademark owner to |
| 22 |    | 'prevent[ ] others from duping consumers into buying a product they mistakenly |
| 23 |    | believe is sponsored by the trademark owner.'" *Mattel, Inc. v. Walking Mountain* |
| 24 |    | *Prods.*, 353 F.3d 792, 806 (9th Cir. 2003) (citing *Mattel, Inc. v. MCA Records,* |
| 25 |    | *Inc.,* 296 F.3d 894, 900 (9th Cir. 2002)). |
| 26 | 94. | "Generally, to assess whether a defendant has infringed on a plaintiff's trademark, |
| 27 |    | we apply a 'likelihood of confusion' test that asks whether use of the plaintiff's |
| 28 |    | trademark by the defendant is 'likely to cause confusion or to cause mistake, or to |

|   |   |
|---|---|
| 1 | deceive as to the affiliation, connection, or association' of the two products." *Id.* at 806-807 (citing *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1149 (9th Cir. 2002)). "[T]he ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks. Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical[:] is there a 'likelihood of confusion?'" *New W. Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979) (citations omitted). |
| 95. | The Court finds no evidence of actual confusion by any consumer when purchasing STONE CREEK furniture in the BTTT, but even had Stone Creek shown a trivial number of purchasers had been actually confused, a trivial number of instances of actual confusion does not meet the test for trademark infringement. The test is whether the defendant's mark is "likely to confuse an *appreciable* number of people as to the source of the product." *Falcon Stainless, Inc. v. Rino Cos.*, 572 Fed. App'x 483, 486 (9th Cir. 2014) (citing *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002)); *see also Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1026 (9th Cir. 2004) ("[A]ctual confusion among significant numbers of consumers provides strong support for the likelihood of confusion."). |
| 96. | When assessing the likelihood of confusion, the Court may consider the following, non-exhaustive factors: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979), abrogated on other grounds by *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806 (9th Cir. 2003). |
| 97. | These factors must be applied in a "flexible fashion" as they are intended merely as a proxy or substitute for consumer confusion, "not a rote checklist." *Rearden* |

1    *LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). "A
2    determination may rest on only those factors that are most pertinent to the
3    particular case before the court" and the analysis is "best understood as simply
4    providing helpful guideposts." *Id.* at 1209-10 (quotations and citations omitted).

5    98.  The *Sleekcraft* factors weigh in favor of Omnia. Applying the *Sleekcraft* factors,
6         the Court finds:
7              A. The STONE CREEK mark is strong in Arizona, but it is not recognized
8                 in the BTTT for its relationship to Stone Creek.
9              B. The goods sold by Omnia and Stone Creek are the same.
10             C. The marks are the same.
11             D. There is no evidence of actual confusion by any consumer in the BTTT
12                who purchased Omnia furniture believing it was manufactured or sold
13                by Stone Creek.
14             E. The parties had distinct marketing channels with no opportunity for
15                crossover. Because of the local nature of the furniture industry,
16                consumers in the BTTT were not targeted for marketing by Stone
17                Creek.
18             F. Furniture is expensive and consumers are therefore expected to exercise
19                greater care.
20             G. Bon-Ton selected the mark because it had an American sound to it, and
21                because the marketing material and logo already existed and were in the
22                possession of Omnia. There was no intent to trade off of Stone Creek's
23                goodwill.
24             H. Stone Creek has no plans to expand.
25   99.  Even if the *Sleekcraft* factors weighed in Stone Creek's favor, they may take a
26        back seat when territorial divisions prevent confusion. "Even where the *Sleekcraft*
27        factors weigh in favor of the [plaintiff], . . . territorial divisions may prevent
28        confusion. An unauthorized junior mark user . . . can contest likelihood of

confusion by arguing that, since 'the registrant and the unauthorized user are confined to two sufficiently distinct and geographically separate markets,' there is no likelihood of confusion." *Russell Rd. Food & Beverage, LLC v. Spencer*, No. 2:12-cv-01514-LRH-GWF, 2013 WL 321666, at *2 (D. Nev. Jan. 28, 2013) (citing *Dawn Donut Co., Inc. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364 (2d Cir. 1959)); *cf. Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 844 (9th Cir. 1969) ("[W]here a federal registrant has expanded its business to the point that the use of the conflictingly similar marks by the registrant and the unauthorized user are *no longer confined to separate and distinct market areas* and there is established the likelihood of public confusion, the federal registrant is entitled under the authority of the Lanham Act to injunctive relief.") (emphasis added).

100. Because furniture consumers are local consumers, and because Stone Creek's entire market was Arizona and Bon Ton's market was the five Midwest states of the BTTT—markets that are over 1000 miles at their closest points and nearly 2000 miles at their furthest—territorial isolation prevented the likelihood of confusion of an appreciable number of consumers in the BTTT.

101. "[T]he sine qua non of trademark infringement is consumer confusion," *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1149 (9th Cir. 2011). Because of the separate markets that exist here, there is no likelihood of confusion under any test, including the *Sleekcraft* factors.

102. The evidence supports a finding that separate markets prevented the likelihood of confusion:

    A. Consumers in the BTTT were unaware of Stone Creek;

    B. The vast majority of Google searches for Stone Creek Furniture originate in Arizona;

    C. The number of Google searches for the Stone Creek website from the BTTT were negligible;

D. Stone Creek had no brand awareness in the BTTT;

E. There was no actual confusion by a consumer in the BTTT purchasing Omnia STONE CREEK furniture.

103. Omnia is not liable to Stone Creek on any of Stone Creek's claims. Accordingly,

**IT IS ORDERED** finding in favor of Defendant Omnia Italian Designs, Inc., and against Plaintiff Stone Creek, Inc. on all counts and all causes of action. The Clerk shall enter judgment in accordance with this Order.

Dated this 9th day of November, 2015.

Douglas L. Rayes
United States District Judge